UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| James Prince and Thomas Randle, | § § § | |
| Plaintiffs, | § § | |
| versus | § § | Civil Action H-07-4274 |
| Viacom, Inc., et al., | § § § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1.    *Introduction.*

Two music promoters visited a friend in prison and posed for a photograph with him. Years later, a television program used the picture in a documentary about the friend. The promoters sued the television channel, its parent company, and an Internet vendor for defamation and misappropriation of their image. They lose.

2.    *The Picture.*

James Prince owns Houston-based music label, Rap-A-Lot Records, and Thomas Randle works for him. Over twenty years ago, they visited Larry Hoover, a leader of a Chicago street gang. They went to see Hoover in the Vienna unit of the Illinois state prison – about five hours south of Chicago or two hours southeast of Saint Louis. While there, they posed with him for a photograph – a snapshot.

3.    *The Show.*

In early 2007, producers of the television series American Gangster interviewed Winndye Jenkins, Hoover's wife. She gave them the use of her photographs, including the one with Hoover, Prince, and Randle, for an episode on Hoover.

Black Entertainment Channel, LLC, a subsidiary of Viacom, Inc., bought the series and promoted it with a commercial in September. The commercial contained several photographs

of Hoover, including the one of Prince and Randle. In the commercial, their faces showed on screen for one second as the words "they were killers, they were criminals" were spoken. In the episode on Hoover, the photograph appeared four times. Prince and Randle were not identified in the broadcasts other than by having their picture shown.

After Prince and Randle complained, BET lost its nerve and edited the episode to obscure their faces. iTunes Store – an online operation of Apple, Inc. – sold the Hoover episode, but it did not use the commercial.

4. *The Reaction.*

Prince and Randle say that the commercial's narration – they were killers – as their picture was shown on screen suggested to viewers that they were a part of Hoover's crimes. They say that their reputation has been tarnished, and they have lost two investments as a result of the false portrayal in the broadcasts.

They also complain that the producers misappropriated their image. They say that the producers could not use their image for profit without their consent.

BET, Viacom, and Apple move for summary judgment. They say that Prince and Randle were not defamed in the show. They say that they did not capitalize on the earned value associated with the promoters' likeness. They say that the photograph was used incidentally in the broadcast. They say that they had the permission of the photograph's owner to use it – Winndye Jenkins. The Constitution protects discussion in most cases from claims of property or injury.

5. *Defamation in the Episode.*

To establish actionable defamation, Prince and Randle must be the object of false, derogatory statements of fact. The character of a statement is determined by a full-informed, disinterested person – a reasonable viewer. Prince's and Randle's sense of injury or offense is of no importance; this is both because of the moral hazard of allowing someone to grab money based on an idiosyncratic, subjective perception and because the rule of law requires a measurable standard. The law requires that a reasonable viewer directly comprehend that the statement refers to the plaintiff – and no one else. *See New Times, Inc. v. Isaacks*, 146 S.W.3d 144 (Tex. 2004). The statement must also be evaluated in its context – not in insolation. *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp.2d 1113, 1120 (C.D. Cal. 1998).

The promoters insist that when the producers showed their photograph during negative commentary, they had been necessarily defamed. The narration during the time their photograph was on the screen was:

- "Hoover was a cult figure, he became bigger than life."
- "Hoover's supporters paint a different picture."
- "Larry may not have been able to leave Vienna, but anyone could come to him."
- "Investigators were convinced that not all of Hoover's visitors were agents of social change."

None of the statements mentions Prince or Randle. All four expressly mention Hoover. Two mention Hoover's visitors – a class of people that included the promoters. It was true that Hoover could have visitors. The photograph is proof of that.

After discussing Hoover's community work with Save the Children, the disembodied voice again told the truth. All of Hoover's visitors were not civic workers. The non-charitable visitors included the promoters; for they have sworn that they visited him to discuss a business deal about a clothing line of Hoover's wife.

The final statement is also not a fact about any visitor but about what investigators thought of Hoover's visitors. Because it is an assertion about a third party's opinion, it is not a defamatory fact, and it is not tied to Prince and Randle.

A reasonable viewer would not find that Prince and Randle were linked to the illegal activity of Hoover by virtue of their photograph together. They would not know who they were after seeing their 20-year old picture; they would not know what crime they had helped Hoover commit. The picture accurately represented Hoover and two visitors – Prince and Randle. *See e.g., Hartman v. Meredith Corp.*, 638 F. Supp. 1015, 1017 (D. Kan. 1986) (finding that "the imposition of plaintiffs' photograph in the absence of any mention of plaintiffs' names linking them with the illegal activity does not constitute defamation as a matter of law").

6.  *Defamation in the Commercial.*

Prince and Randle say that the narration "they were killers, they were criminals, that they intended to keep their thing going" in the commercial, while their pictures were shown, is derogatory. Reasonable viewers may conclude that the promoters are disreputable people from the picture and the explanation of Hoover's history. A viewer might infer that normal people do not visit guys in prison – and have a snap shot taken with him. To that extent, the promoters may have lost standing in their community, but they cannot complain of a broadcast of accurate pictures of their social choices.

After all, in a country of free men, the public evaluates what speakers offer, not the people who are the topics or those who associate with the topics. *See* Thomas I. Emerson, *The System of Freedom of Expression* 543 (Random House, 1970).

Finally, the promoters have no claim against Apple, Inc., because it did not publish the commercial on iTunes.

7.   *Misappropriation.*

When a person's investment in an activity generates publicity derived from and a part of his presented image, he may protect his proprietary interest in that image.

The promoters complain that the producers used their likeness – not an established image – for profit. People do not have a legally protectable interest in their pictures, names, or activities. We are all available as material for news stories, novels, histories, and the rest. Others can use what we do for profit. Newspapers only survive if they profit from the pictures and stories of people – uncompensated and non-consenting people. The law protects a narrow range of information and uses. *See* Restatement (Second) of Torts § 625(C) (1977); *see Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994); *see also Hurlburt v. Gulf Atlantic Insurance Company*, 749 S.W.2d 762 (Tex. 1987); *see e.g., Frosch v. Grosset & Dunlap, Inc.*, 427 N.Y.S.2d 828 (1st Dept. 1980)(novel parallel to Marilyn Monroe's life).

Aside from the populist whine about others' profiting, the promoters have no interest in a photograph that they gave to a third party twenty years ago. That image is not theirs and has not been since before the Internet. Jenkins swears now that she would not have given the picture and the release to the producers if she had known how they would have used them. (Jenkins Aff., dkt. 24, exh. 1, Feb. 8, 2008). Like the promoters, she can not recreate the past to suit her current wishes.

Next, Prince and Randle have put themselves in circulation – talk shows, press conferences, and news stories. They are marginal celebrities. By their choices, they invite attention. Like many "stars" before them, they would prefer to monitor who may say what. When you use the free market of expression, it has a converse consequence – it may use you.

No one is tying his product to Prince or Randle by showing their photograph with the good or service. BET, Viacom, and Apple did not capitalize on the goodwill associated with the promoters' relationship to products or practices. The producers did not drain the promoters' own reservoir of earned goodwill.

The producers sought to profit by telling stories about life in America. They used the photograph to illustrate a fact – Hoover had visitors in prison. If Hoover's guests are somehow

notable that makes the visit a more compelling story than obscure visitors. If the promoters are as famous as they think, the use may have been more than incidental, but raw notoriety is not being saturated with commercial goodwill that is being exploited by ties to products. "Incidental use" is only a factor when the goodwill exists to be poached, and it must be borrowed for a good or service, not for the sake of the story itself. *See e.g.*, *Johnny Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir. 1983).

Stories that could be called news or stories that are tawdry pandering to shallow sensationalism are all about tastes, preferences, and freedoms of our public. Prince and Randle insist that the network not detract from their personas, but they actively want them to use their names and deeds to promote their recordings. Life has its frictions, and publicity has a fierce reciprocity.

8. *No Harm.*

The promoters say that they lost two investments – a real estate venture and an Internet start-up – because of the broadcasts. As evidence of harm, they supplied an affidavit of vague hearsay statements about why a potential partner dropped out of a deal. They furnished incomplete partnership agreements and photocopies of checks to show that some capital was invested in something. None of these documents suggests, however, that anything like a compensable harm has been suffered at all. Nothing ties even an apparent injury to a false statement by the producers. No attempt was made to account for other causes of rumored dissatisfaction by somebody with something about Prince's and Randle's suitability as a partner in business.

9. *Freedom of Expression.*

The Supreme Court of Florida once decided that a lawsuit "was unquestionably newsworthy, but reports thereof were not constitutionally protected as being matters of real public or general concern." That the public administration of justice – a seventeen month trial – is not of *real* public concern is a contradiction on its face. *Time, Inc. v. Firestone*, 271 So. 2d 745, at 752 (Fla. 1972). The Supreme Court of the United States carefully analyzed fourteen questions in a form circulated by an unhappy public worker, and it decided that one of them was of public interest. *See Connick v. Myers*, 461 U.S. 138, 149 (1983). The idea that a court decides what is of public interest is the antithesis of free expression; its central idea is that the reader, listener, and watcher is free to decide for himself what interests him.

The harm here is to the public's access to stories – factual, fictional or suppositional. Our system works because we do not cordon suitable discussion. Like libel suits for bad book reviews, these suits restrict the scope of public discussion. See *Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994). Publishers and producers pull back, censoring themselves. The cost of a successful defense is sand in the gears of open discussion.

Apologists for the administrative state rely on the statist decisions saying commercial speech is a sub-species of speech – one of a lower dignity than thoughtful discussions of fiscal policy. In the decisions about defamation, courts sometimes mix Victorian concepts of what is acceptable with elitist disdain for the stuff other people read. The scope for libel and slander in a democratic republic should be exceedingly narrow. *See generally* Norman L. Rosenberg, *Protecting the Best Men: An Interpretative History of the Law of Libel* (University of North Carolina Press, 1986).

*10.   Conclusion.*

James Prince and Thomas Randle will take nothing from Black Entertainment Television, LLC, Viacom, Inc., and Apple, Inc. They will not because (a) they were not falsely defamed, (2) they have no proprietary interest in the use of a photograph owned by the people who published it, and (c) as active participants in the free market for speech, they consent to additional speech.

Signed on April 18, 2008, at Houston, Texas.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Lynn N. Hughes      USDJ
　　　　　　　　　　　　　　　　　　　United States District Judge